UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


BANK OF ANN ARBOR,

        Plaintiff,

v.

                                Case No. 12-11251

EVEREST NATIONAL INSURANCE COMPANY,     Honorable Julian Abele Cook, Jr.

        Defendant.


ORDER

       This case involves a complaint by the Plaintiff, the Bank of Ann Arbor ("Bank"), who claims that the Defendant, Everest National Insurance Company ("Everest"), has breached a contract. Currently before the Court are cross motions for summary judgment filed by the Bank and Everest.

I.

       The material facts in this case are undisputed. On December 22, 2010, the Bank purchased a Financial Institution Bond ("FIB") from Everest. The FIB offers indemnification coverage for specific risks typically borne by banks such as losses from robbery or forgery. The FIB was effective from January 1, 2011 through January 1, 2012.

       On October 4, 2011, the Bank received a wire transfer request via facsimile from an individual purporting to be its customer, John Doe.[1] The request was for $196,000. The wire transfer requested that funds from his home equity line of credit be wired to a bank in South Korea. The

---

     [1]In the interests of privacy and pursuant to the Stipulated Protective Order, the customer's identifying information is not included and will not be referred to in these public filings. The customer will be identified only as Customer Doe.

request contained the customer's name and handwritten signature, email address, home address, telephone number, and all of the necessary account information.

In order to prevent fraud, the Bank's established practice is to compare the signature on a request to the signature maintained in the Bank's file and to confirm the request by telephoning the customer. The Bank followed these procedures upon receiving Doe's request. It confirmed that the signature on the faxed request was the same as the signature in Doe's file. Then, the Bank called the telephone number in Doe's file and verified the request with an individual who identified himself as Doe. After completing the verification procedure, the Bank, in good faith and in reliance on the instructions and signature on the wire transfer request, transferred $196,000 to Korea Exchange Bank in Seoul, South Korea.

Two days later, the Bank received a second faxed wire transfer request from Doe. The request was for $98,000 and again asked that the funds be transferred from his home equity line of credit account to the same bank in South Korea. This second wire transfer request was received by a Bank employee who coincidentally happened to know Doe personally and questioned why he would want to wire money to South Korea. A review of Doe's file revealed that on September 30, 2011, the Bank had received an email from an individual identifying himself as Doe inquiring how to change his telephone number on record with the Bank. The Bank had informed the sender that such requests must be in writing. Later that same day, the Bank received another email purportedly from Doe with an attached formal, written request to have his telephone number changed, which was signed by Doe. After comparing the signature on the letter request to the signature in Doe's file, the Bank changed Doe's telephone number in its files.

Upon discovering that his contact information had been changed, the Bank immediately

contacted Doe at the different, older number and learned that he had not made either wire transfer request. Accordingly, the second request was not honored and the Bank contacted local law enforcement to assist in the investigation. The Bank repaid the $196,000 to Doe's account.

On October 4, 2011, after completing its investigation, the Bank notified Everest of the above facts and requested coverage for the $196,000 wire transfer. The Banks' request to Everest was timely and satisfied the requirements for the submission of a claim under the terms of the FIB.

On January 23, 2012, Everest denied coverage to the Bank under two grounds. First, Everest asserted that a rider to the FIB precluded coverage. Second, Everest asserted that the loss was excluded under Exclusion (e) as a loan loss. Bank of Ann Arbor filed this lawsuit on March 20, 2012, to recover its $196,000 loss under the FIB.

## II.

The purpose of the summary judgment rule, as reflected by Federal Rule of Civil Procedure 56, "is to isolate and dispose of factually unsupportable claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The entry of a summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties." *Aqua Grp., LLC v. Fed. Ins. Co.*, 620 F. Supp. 2d 816, 819 (E.D. Mich. 2009) (citing *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). In order for a dispute to be genuine, it must contain evidence upon which a trier of the facts could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 560 (6th Cir. 2004). When assessing

a request for the entry of a summary judgment, a court "must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party." *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). The entry of a summary judgment is appropriate if the nonmoving party fails to present evidence which is "sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

Thus, the moving party has the initial obligation of identifying those portions of the record that demonstrate the absence of any genuine issue of a material fact. *Celotex*, 477 U.S. at 323. Thereafter, the nonmoving party must "come forward with some probative evidence to support its claim and make it necessary to resolve the differences at trial." *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir. 1991); *see also Anderson*, 477 U.S. at 256. The presence or the absence of a genuinely disputed material fact must be established by (1) a specific reference to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or (2) a "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

III.

The Bank's motion for summary judgment contends that the loss was covered by the plain language of the FIB. Everest's motion for summary judgment contends that the loss is excluded under Exclusion (e) which excludes losses resulting from the extension of credit.

Under Michigan law, "[i]nterpretation of an insurance policy ultimately requires a two-step

4

inquiry: first, a determination of coverage according to the general insurance agreement and, second, a decision regarding whether an exclusion applies to negate coverage." *Auto-Owners Ins. Co. v. Harrington*, 565 N.W. 2d 839, 841 (Mich. 1997).  Michigan law treats insurance contracts the same as any other contract; the court will determine what the agreement was between the parties and enforce it accordingly. *Auto-Owners Ins. Co. v. Churchman*, 489 N.W. 2d 431, 433 (Mich. 1962). Courts are to interpret insurance contracts in accordance with the plain meaning of the words and phrases used. *Henderson v. State Farm and Casualty Co.*, 596 N.W.2d 190, 195 (1999).

The Bank submits that the loss is covered under the Insuring Agreement D of the FIB, entitled "Forgery or Alteration." That provision guarantees coverage of any:

> Loss resulting directly from the Insured having, in good faith, paid or transferred any Property in reliance on any Written Original ...
>
> > (4) Withdrawal Order [or] ...
> >
> > (6) instruction or advice purportedly signed by a customer of the Insured ... which
> >
> > > (a) bears a handwritten signature of any maker, drawer, or endorser which is a Forgery ...
>
> A reproduction of a handwritten signature is treated the same as the handwritten signature.

Additionally, Agreement D is clarified by the "Unauthorized Signature Rider," which provides in relevant part: "Accepting, paying or cashing any Written, Original, . . .Withdrawal Orders that bear Unauthorized Signatures ... shall be deemed to be a Forgery" so long as the Bank has "on file the signature of all persons authorized to sign such ... Withdrawal Orders."

The plain language of the Agreement covers the loss.  The Bank completed the $196,000 transfer upon receipt of a faxed withdrawal order that purported to be signed by the account holder.

The loss clearly resulted from a forged original signature that was faxed to the Bank. The "Unauthorized Signature Rider" further supports this conclusion. It is undisputed that the Bank paid out funds based on a forged withdrawal order and that the Bank had Doe's signature on file. There is no ambiguity in the agreement or the rider.

Everest submits that an exclusion to the agreement precludes coverage for the Bank's loss.

Section 2(e) of the FIB excludes:

> (e) loss resulting directly or indirectly from the complete or partial nonpayment of, or default upon any Loan or transaction involving the Insured as a lender or borrower, or extension of credit, including the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes, agreements of Evidences of Debt, whether such Loan transaction or extension was procured in good faith or through trick, artifice, fraud, or false pretenses, except when covered under Insuring Agreements (A), (E) or (G).

Pursuant to the definition section of the FIB:

> Loan means all extensions of credit by the Insured and all transactions creating a creditor relationship in favor of the Insured and all transactions by which the Insured assumes an existing creditor relationship.

Everest submits that the loss resulted from the extension of credit and is therefore excluded from coverage. However, the clear meaning of Exclusion (e) is that Everest will not cover a loss resulting from a customer default on a loan or extension of credit made by the Bank. The loss did not result from the nonpayment of a loan. The home equity line in question was secured by the customer's home as collateral for the line of credit. It is undisputed that Doe did not borrow the money from the Bank; he did not receive the funds and he did not agree to repay the debt. Doe was unaware of these transactions until he was notified of the fraud by the Bank. The loss at issue here is not the result of a loan. The risk at issue was the risk of forgery- a risk that is expressly covered by the FIB. *See also People's State Bank v. American Casualty Co. of Reading, Pa.,* 818 F. Supp. 1073 (E.D.

Mich. 1993) (finding that an identical FIB covered loss relating from a bank employee who fraudulently filled out loans and received the proceeds); *Bankinsure, Inc. v. Peoples Bank of the South*, 866 F. Supp. 2d 577 (S.D. Miss. 2012) (losses based on forged customer signatures are covered are did not constitute loans). The Bank is entitled to reimbursement for the loss under the FIV.

For the reasons stated above, the Bank's motion for summary judgment is granted. (ECF 12). Everest's motion for summary judgment is denied. (ECF 19).

IT IS SO ORDERED.

Date: February 25, 2013                    s/Julian Abele Cook, Jr._____
                                           JULIAN ABELE COOK, JR.
                                           United States District Judge

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on February 25, 2013

                                           s/ Kay Doaks_____
                                           Case Manager

7